IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GUY MASON, | : | |
| | : | Case No. 2:14-CV-00446 |
| **Plaintiff,** | : | |
| | : | JUDGE ALGENON L. MARBLEY |
| v. | : | |
| | : | Magistrate Judge Kemp |
| WAL-MART CORPORATION, | : | |
| | : | |
| **Defendant.** | : | |

### **OPINION & ORDER**

This matter comes before the Court for consideration of Defendant Wal-Mart Corporation's Motion for Summary Judgment. (Doc. 70.) The Court scheduled a hearing on the motion for May 2, 2016 but Plaintiff's counsel failed to appear. Accordingly, the Court has decided the motion without oral argument. For the reasons that follow, the Court **GRANTS** Wal-Mart's Motion for Summary Judgment in its entirety.

### I.  BACKGROUND

#### A. Factual Background

This case arose from the Steubenville Police Department's ("SPD") arrest of Plaintiff Guy Mason in the middle of the night on May 24, 2013 near a Wal-Mart store in Steubenville, Ohio. Mason drove his car, a green Jeep, to the store around 2:00 a.m. to shop for plants. (Deposition of Guy Mason, Doc. 67 at 76.) The Jeep was full of plants, household goods, clothing, food, tools, and cleaning supplies because Mason was in the process of moving from his parents' house to an apartment. (*Id.* at 56-57, 66.) After getting out of his car, he approached an uncovered parking lot display, which was located outside the store and contained flowers and fruit trees for purchase. (*Id.* at 77, 80.)

1

According to Mason, a Wal-Mart employee approached him and Mason inquired about the price of a plant he had picked up from the display. (*Id.* at 77.) The employee, who was watering some plants, told him Mason would have to take the plant into the store to get a price check himself. (*Id.* at 78.) It started to rain, and Mason decided that since he was cold he did not want to walk all the way around to the open entrance on the other side of the store to find out the price, so he put the plant back and headed back to his car. (*Id.* at 81, 85.) As he was walking toward his Jeep, he saw a man in khaki pants and a striped shirt pull up to the Jeep in a van, get out,[1] and look inside the Jeep. (*Id.* at 86, 89-90.) The man drove away in his van by the time Mason reached the Jeep. (*Id.* at 97.)

The man, a Wal-Mart shift manager named William Mainwaring, had been sitting in his van during a break in his shift when he saw Mason, whose shopping for plants in a dark area at that hour of the night triggered Mainwaring's suspicion that Mason might be shoplifting. (Deposition of William Mainwaring, Doc. 71-3 at 5.) Mainwaring stated that he had never seen a customer shop for plants at that hour of the night except on one occasion in a fenced-in, lit area. (*Id.* at 18.) He also explained that it was Wal-Mart's policy to show "aggressive hospitality" toward suspected shoplifters inside the store in order to encourage them not to steal merchandise, but that in potentially dangerous situations—if the potential shoplifter might have had a gun or was outside of the store—employees were encouraged to call the police. (*Id.* at 28; *see also* Deposition of Jerry Burner, Doc. 71-2 at 46-47, 52.) After a few minutes of watching Mason shop, Mainwaring called the store's assistant manager, Jerry Burner, and told him that he was watching a person shopping for plants in a "kind of suspicious" manner. (Mainwaring Dep., Doc. 71-3 at 22.) After Mainwaring reached Mason's Jeep and looked inside, he called Burner

---

[1] The Wal-Mart employee, later identified as William Mainwaring, testified that he never got out of the vehicle. (Deposition of William Mainwaring, Doc. 71-3 at 35-36.)

again and asked him to call the police. (*Id.*) He told Burner that he did not know if Mason had shoplifted but that, based on what Mainwaring had observed, Burner should call the police. (*Id.* at 29.) Mainwaring then watched Mason drive out of the parking lot, turn left on Mall Drive, and head toward Lover's Lane, where Mainwaring saw a plain white Crown Victoria begin to follow the Jeep. (*Id.* at 38, 40.) As Mainwaring returned to the store, he could see police cars beginning to gather on Lover's Lane. (*Id.* at 41.)

After he spoke to Mainwaring, Burner called the police. On the call, Burner told the dispatcher that there was a man at the Steubenville Wal-Mart store "loaded up with plants." (911 Audio, Doc 70, Ex. B.) He further stated that "we're not sure if it's anything." (*Id.*) He then gave the police the Jeep's description and license plate number. (*Id.*) The dispatcher relayed to the officers on their way to Lover's Lane that Mason had items from the Wal-Mart that its employees "believe he hadn't paid for." (911 Audio, Doc. 70, Ex. C.) SPD Officer Geoffrey Palmer later stated in his deposition that the officers believed upon arriving at the scene that Wal-Mart employees had told the dispatcher that Mason had stolen items from Wal-Mart. (Deposition of Geoffrey Palmer, Doc. 71-6 at 18.) SPD Officer James Sloane stated that when he arrived on the scene he thought the items in Mason's car had been reported as "possibly stolen." (Deposition of James D. Sloane, Doc. 71-7 at 20.)

When Mason drove out of the store parking lot, he saw a plain white car in his rearview mirror (Mason Dep., Doc. 67 at 98.) Mason testified in his deposition that he had used a turn signal before turning, but he was pulled over by the unmarked vehicle, driven by Sergeant Jeffrey Sterling from the Jefferson County Sheriff's Office, and another police vehicle, driven by Ohio State Highway Patrol Trooper Mason Boyce. (*Id.* at 100; Deposition of Jeffrey E. Sterling, Doc. 71-8 at 22.) Sterling asked Boyce to make the stop since Sterling was driving an unmarked

3

vehicle. (Deposition of Mason Boyce, Doc. 71-1 at 19.) After checking for Mason's license and registration, Trooper Boyce informed Mason that he did not use a turn signal before making the turn onto Lover's Lane, which Deputy Sterling had observed.[2] (Mason Dep., Doc. 67 at 103-04; Boyce Dep., Doc. 71-1 at 36; Sterling Dep., Doc. 71-8 at 22.) Trooper Boyce commented that Mason appeared to have a lot of stuff in the back of his car and asked if he had any receipts. (Mason Dep., Doc. 67 at 104.) As Mason was reaching for his checkbook, which he testified contained receipts, Trooper Boyce told him to get out of the vehicle. (*Id.* at 105.) Steubenville Police Department Officers Sloane, Palmer, and Regis Holzworth arrived within the next few minutes. (Boyce Dep., Doc. 71-1 at 25; Sterling Dep., Doc. 71-8 at 30.)

The SPC officers told Mason that they were going to search the vehicle because Wal-Mart had told the police that Mason had been at the store, and the SPD wanted to see if he had anything from Wal-Mart. (Mason Dep., Doc. 67 at 107-08.) Mason was placed in Officer Sloane's police cruiser. (*Id.* at 116.) Officer Palmer then conducted a search of the vehicle, finding potted plants, a lawn mower, a weed eater, and other items, many of which were still in their original packaging. (Palmer Dep., Doc. 71-6 at 30-31.) At some point during the stop and search, the dispatcher informed the officers over the radio that "Guy Mason has two to three prior shoplifting issues." (*Id.* at 20.) It is not clear from the record when this information came over the radio or who heard it. (*See id.* at 20, 23-24; Sloane Dep., Doc. 71-7 at 10.)

While Mason was in the cruiser, Mainwaring, the Wal-Mart employee he had spotted earlier, drove up with Officer Palmer, who had fetched him from the store so that he could try to identify the merchandise in the Jeep. (Mason Dep., Doc. 67 at 118-19; Boyce Dep., Doc. 71-1 at 30; Sterling Dep., Doc. 71-8 at 30; Mainwaring Dep., Doc. 71-3 at 42.) Mainwaring looked in

---

[2] Ultimately, the police did not issue a citation to Mason for failure to use a turn signal. (Declaration of Guy Mason, Doc. 77-1 at ¶ 9.)

4

the Jeep and immediately identified some of the items as not sold by Wal-Mart, including a motor and a trimmer. (*Id.* at 43.) He told the police that he was not certain of the origin of other items, but that if they transported the items to the store, he would be able to scan them and determine whether the items were sold by Wal-Mart, although not whether the particular items were stolen. (*Id.* at 44, 46.) Mason, still in Officer Sloane's cruiser, testified in his deposition that he overheard Mainwaring say to the four officers on the scene: "I want that fucking Jeep brought down to my store, and we're going to go through it and see what else he has in there." (Mason Dep., Doc. 67 at 121-22.) Mason overheard this statement while the officers and Mainwaring were huddled together. He then heard one of the officers say "We'll get somebody to drive it down for – for you." (*Id.* at 122-23.)

The SPD officers decided to take the Jeep back to the Wal-Mart to scan the items. (Sterling Dep., Doc. 71-8 at 32.) Trooper Boyce drove Mainwaring back to the store, SPD Officer Palmer drove the Jeep, and other officers followed in their vehicles, including Sloane, who was transporting Mason. (Mainwaring Dep., Doc. 71-3 at 52; Sterling Dep., Doc. 71-8 at 33; Boyce Dep., Doc. 71-1 at 32.) One of the officers also removed Mason from the police cruiser, handcuffed him, put him back in the cruiser, and drove him to the store. (Declaration of Guy Mason, Doc. 77-1 at ¶ 7.) At this point, Mainwaring was still suspicious that some of the items had been stolen, given the multiple quantities of certain items, which he characterized as indicative of shoplifting, but he did not express these suspicions to the police. (Mainwaring Dep., Doc. 71-3 at 50-51.)

Back at the store, Mainwaring called Burner and asked him to come out the front entrance. (*Id.* at 53.) Mainwaring asked Burner to help the police by scanning the merchandise in the Jeep to identify if it was Wal-Mart merchandise. (*Id.*; Burner Dep., Doc. 71-2 at 25.)

5

Burner told the police that a scan of the merchandise would reveal if a particular product was sold by Wal-Mart but it would not reveal whether it was sold by that particular Wal-Mart as opposed to any other Wal-Mart or even another retailer who stocked the item. (*Id.* at 25-26.) Officer Palmer testified that the police also wanted to use the scanner to determine the value of the merchandise because the total value of allegedly stolen items determines whether the SPD charges a shoplifter with a misdemeanor or a felony. (Palmer Dep., Doc. 71-6 at 39-40.)

The SPD officers removed all of the merchandise from the Jeep and handed it over to Burner, who scanned each item while he stood outside near the front entrance of the store, finding that some of the items were ones that Wal-Mart kept in its inventory and some were not. (Burner Dep., Doc. 71-2 at 27-28.) Officers segregated the items that Burner identified as being sold by Wal-Mart from other items that were not. (*Id.* at 29.) When Burner was finished scanning all of the items, the police turned over to Wal-Mart the items that showed up on the scanner as those that Wal-Mart sold. (*Id.* at 54, 61.) Mason testified that while he was sitting in the police cruiser, he saw Mainwaring reach into the Jeep, grab Mason's personal satchel, and take it into Wal-Mart. (Mason Dep., Doc. 67 at 179.) No officers or Wal-Mart employees saw Mainwaring grab anything out of the Jeep or remember seeing the satchel at all.

While Burner was scanning the items, Mainwaring told one of the officers that he wanted to take a look at the surveillance video of the area where he had spotted Mason. (Mainwaring Dep., Doc. 71-3 at 53.) After watching the video, Mainwaring said he was certain that Mason had never gone into the store and that he had not stolen anything from the garden area. (*Id.* at 56.) At some point while the video was playing, Sergeant Sterling came into the store, watched the footage, and told Mainwaring that he agreed that the video indicated that Mason had not stolen anything from the Steubenville Wal-Mart. (*Id.* at 53, 57; Sterling Dep., Doc. 71-8 at 9.)

6

The SPD told Mainwaring that the property that they had segregated as potentially having been sold by Wal-Mart needed to be returned to the Weirton, West Virginia Wal-Mart, another store near the Steubenville Wal-Mart where the SPD believed Mason had gone earlier. (Mainwaring Dep., Doc. 71-3 at 69.)  Officers Palmer and Sloane made the decision to leave this merchandise with Wal-Mart, which Officer Palmer said was common practice when investigating an alleged shoplifting.  (Palmer Dep., Doc. 71-6 at 41-42.)  After the police left the property with Mainwaring and Burner, Mainwaring left a note for the Steubenville store's asset protection manager that the property may have been from the Weirton Wal-Mart store. (Mainwaring Dep., Doc. 71-3 at 65-66.)  A few days later, the asset protection manager told Mainwaring that Weirton Wal-Mart employees had come to pick up the property.  (*Id.* at 68; Burner Dep., Doc. 71-2 at 55.)

After the police handed the property over to Wal-Mart, they transported Mason to the police station where he was booked for receiving stolen property and then taken to jail.  (Mason Dep., Doc. 67 at 128, 131.)  The Steubenville city prosecutor, John Mascio, verified the criminal complaint against Mason.  (Sloane Dep., Doc. 71-7 at 46; Criminal Complaint, Doc. 70, Ex. D.) Mason spent 11 days in jail.  (Mason Dep., Doc. 67 at 132.)  Ultimately, a grand jury in the Jefferson County Municipal Court issued a "no bill," declining to indict him on the charge of receiving stolen property, and he was released from custody.  (*Id.* at 169.)

### B. Procedural History

Plaintiff commenced this action against Wal-Mart Corporation and several others on May 14, 2014.  (Doc. 1.)  He filed an amended complaint two days later.  (Doc. 2.)  After various Defendants filed motions to dismiss, Plaintiff reached settlements with or voluntarily dismissed the following Defendants: Big Lot Stores (Doc. 38); Family Dollar Stores of Ohio (Doc. 41);

Lowe's Home Centers (Doc. 44); Kmart Corporation (Doc. 49); the City of Steubenville, Officer Sloan, Officer Holzworth, and Officer Palmer (Doc. 55); Jefferson County Sheriff Fred Abdalla and Sergeant Sterling (Doc. 63); and Dollar General Stores (Doc. 76).  This Court also granted Defendant Mason Boyce's Motion to Dismiss for failure to state a claim upon which relief could be granted and granted Plaintiff leave to amend his complaint.  (Doc. 57.)  Plaintiff amended his complaint but stipulated to the dismissal of Defendant Boyce.  (Docs. 58, 59.)  Wal-Mart is now the only remaining Defendant.  The claims in the Amended Complaint that pertain to Wal-Mart include: conspiracy to violate Plaintiff's Fourth Amendment rights to be free from unreasonable searches and seizures and malicious prosecution (Count IV); and state-law claims for malicious prosecution (Count V); false arrest (Count VI); conversion (Count VII); and spoliation (Count VIII).

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992).  Summary judgment is inappropriate, however, "if the dispute about a

8

material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. ANALYSIS

As a threshold matter, Plaintiff has explicitly abandoned his malicious-prosecution and spoliation claims in his response in opposition to Wal-Mart's motion for summary judgment. (Doc. 78 at 9.) Therefore, the Court will address only the civil-conspiracy, false-arrest, and conversion claims. The Court **GRANTS** Wal-Mart's Motion for Summary Judgment on the malicious-prosecution and spoliation claims.

#### A. Section 1983 Conspiracy Claim

To prevail in a cause of action under 42 U.S.C. § 1983, a plaintiff must show that a person acting under color of state law has deprived her of a right, privilege, or immunity secured by the Constitution or laws of the United States. Generally, private actors do not act "under color of" state law for purposes of a § 1983 claim and, therefore, may not be subject to suit under § 1983. When a private party conspires with a government employee, however, liability may

9

attach to the private party. *Memphis Tenn. Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). The Sixth Circuit has defined a civil conspiracy under § 1983 as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). Because "direct evidence of an express agreement among all the conspirators to conspire" is rare, "circumstantial evidence may provide adequate proof of conspiracy." *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) (quoting *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000)).

To survive summary judgment against Wal-Mart on the conspiracy claim, Mason must show some "evidence from which to infer that [Wal-Mart] acted in concert" with law enforcement to violate his Fourth Amendment right to be free from unlawful searches and seizures. *Id.* Plaintiff's evidence of a "single plan" essentially boils down to a "huddle" of Mainwaring and several law enforcement officers while Mason was detained in the back of Officer Sloane's cruiser on Lover's Lane. According to Plaintiff, this huddle is circumstantial evidence that Mainwaring conspired with law enforcement to charge Mason with the felony of receiving stolen property and to confiscate his property. But this huddle does not constitute even circumstantial evidence that points to a conclusion that there was a single plan among law enforcement and Mainwaring.

First of all, Burner's call to law enforcement is not consistent with a conspiratorial objective. He stated that he saw a man whose car was "loaded up with plants" but that "we're

10

not sure if it's anything." (911 Audio, Doc 70, Ex. B.) Mason does not contend that this statement was false. When the dispatcher relayed information from the call to law enforcement, he stated that Mason had items from the Wal-Mart that Wal-Mart employees "believe he hadn't paid for," which Burner never told the dispatcher. (911 Audio, Doc. 70, Ex. C.)

Second, there is no evidence that either Mainwaring or Burner was involved in the decision to search the Jeep at Lover's Lane or the Wal-Mart parking lot, and Mainwaring even testified that he commented to the officers at Lover's Lane that he knew that some of the items were definitely not Wal-Mart products. (Mainwaring Dep., Doc. 71-3 at 43; *see also* Sloane Dep., Doc. 71-7 at 27 (stating that no Wal-Mart employees participated in the search of the Jeep).)[3] There is also uncontroverted evidence in the record that the SPD made the decision to pick up Mainwaring to bring him to Lover's Lane; Mainwaring did not initiate this visit. (*See* Steubenville Police Department Dashboard Audio, Doc. 81, Ex. D 1:25:08 ("Car 10 is going to go back to Wal-Mart. He's going to get an employee there to go back up to the scene at Lover's Lane.").)[4]

Third, Burner and Mainwaring told law enforcement that scanning the items in Mason's car would not reveal if they had been stolen from the Steubenville Wal-Mart. Rather, the scan

---

[3] Mason does not appear to contest that the initial search of the Jeep on Lover's Lane occurred before Mainwaring even arrived on the scene. (*See* Mason Decl., Doc. 77-1 at ¶¶ 4-6; Steubenville Police Department Dashboard Audio, Doc. 81, Ex. D 1:25:08.) This is consistent with officer testimony that SPD officers made the decision to search the car shortly after they arrived on the scene, as well as the SPD dashboard audio and video, which make clear that SPD officers had started searching the car before Mainwaring arrived at the scene. (Palmer Dep., Doc. 71-6 at 29-30; SPD Dashboard Audio, Doc. 81, Ex. D, 1:25:52-53.)

[4] Mason recalled that Mainwaring drove his own van to Lover's Lane, but this statement is "blatantly contradicted by the record" and the Court will not adopt it for purposes of ruling on the motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). All of the officers, and Mainwaring himself, testified that Officer Palmer picked up Mainwaring and drove him to Lover's Lane, and the dashboard audio corroborates this testimony. (SPD Dashboard Audio, Doc. 81, Ex D, 1:25:52-53.)

could only show whether the item was sold by any Wal-Mart. (Burner Dep., Doc. 71-2 at 25-26; Mainwaring Dep., Doc. 71-3 at 44, 46.) These statements were corroborated by Officer Sloane's testimony that Officer Palmer had told him that the scanner could only identify whether the item was something that Wal-Mart typically sells, and Officer Sloane's written report, which stated that Officer Palmer relayed to Officer Sloane that Mainwaring "could not determine which Wal-Mart stores the items originally came from at that time." (Sloane Dep., Doc. 71-7 at 24.)

Fourth, after Mainwaring went back into the store to examine the security tape while Burner was scanning items that law enforcement unloaded from the Jeep, he confirmed that the footage did not show Mason stealing any plants, and he shared his conclusion with Deputy Sterling, who had come in to watch the video with him and also agreed that the video did not show theft. (Mainwaring Dep., Doc. 71-3 at 53, 57; Sterling Dep., Doc. 71-8 at 9-10.)

None of this evidence suggests the existence of a single plan to injure Mason through an illegal search or seizure. *Spadafore*, 330 F.3d at 854. Other than the huddle, the only evidence to which Mason points to suggest a conspiracy is: (1) back in the Wal-Mart parking lot, Mainwaring reached into the Jeep and took Mason's personal satchel, which Mason says he never saw again; and (2) at the scene on Lover's Lane, Mason overheard Mainwaring say to the officers: "I want that fucking Jeep brought down to my store, and we're going to go through it and see what else he has in there." (Mason Dep., Doc. 67 at 121-22.) Even if Mainwaring did make that statement—which is not corroborated by any of the other officers or Mainwaring himself (*see, e.g.*, Boyce Dep., Doc. 71-1 at 47-48)—it is insufficient to survive summary judgment. The officers' testimony all consistently reflects that it was the SPD that made the decision to take the Jeep back to Wal-Mart and scan the merchandise. (Sterling Dep., Doc. 71-8 at 32.) And this decision "is just as consistent with independent conduct as it is with a

conspiracy." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) ("There is no indication that when the [police officers] met [the defendant], they discussed anything other than the [police officers] would follow [the defendant] to the [plainitff's] residence."); *see also Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) ("[C]ircumstantial evidence must tend to exclude the possibility of independent conduct."). Given the erroneous information they had received from the dispatcher, deciding to take the Jeep back to Wal-Mart and scan the items within it was consistent with independent decision-making by a police department. *See also Cruz v. Donnelly*, 727 F.2d 79, 80 (3d Cir. 1984) (upholding a grant of summary judgment to a store manager because the store manager's accusations of shoplifting and "order[s]" to the police to strip-search the plaintiff were not evidence of a prearranged plan between the manager and the police to deprive the plaintiff of his constitutional rights).

      As to the satchel, there is no evidence in the record about the satchel besides Mason's testimony, nor is there any evidence that Mainwaring and Burner made an independent decision to keep any items that the police seized. Rather, all of the testimony indicates that the police instructed them to keep the items and have the Weirton Wal-Mart pick them up. (Mainwaring Dep., Doc. 71-3 at 69; Palmer Dep., Doc. 71-6 at 41-42.) Even if the Court assumes that Mason's testimony about the satchel is true, summary judgment on this claim is warranted nevertheless because the circumstantial evidence presented—namely, the huddle and Mainwaring's alleged, and uncorroborated, comment about bringing the Jeep back to the store—"reveals that there is no evidence beyond mere conjecture and speculation that an agreement existed, thus [] precluding a finding of a conspiracy." *Moore v. City of Paducah*, 890 F.2d 831, 834 (6th Cir. 1989); *see also Spadafore*, 330 F.3d at 854 (finding no direct or circumstantial evidence of a single plan at the time that the alleged constitutional violation occurred).

In addition to the fact that the conduct of Mainwaring and Burning refutes any conclusion that there was a single plan between them and law enforcement, there is also no other circumstantial evidence from which a reasonable jury could infer a conspiracy between Wal-Mart and law enforcement.  For instance, there is no evidence that Wal-Mart or its employees had a "special relationship" with law enforcement, or that Wal-Mart possessed or exerted any particular influence over law enforcement.  *See Haley v. Wascom*, No. 5:13-cv-232, 2015 WL 4987564, at *7 (N.D. Ohio Aug. 19, 2015) (citing *Wagenmann v. Adams*, 829 F.2d 196, 210-11 (1st Cir. 1987)); *cf. Cruey v. Huff*, No. CIVA 7:09-cv-00516, 2010 WL 1539995, at *3 (W.D. Va. Apr. 16, 2010), *aff'd sub nom. Cruey v. Kirby*, 445 F. App'x 647 (4th Cir. 2011).  There is nothing in the record to suggest that Wal-Mart was "anything more than [a] mere complainant[] at the [Steubenville] Police Department, or that [it] possessed or exerted influence over [the SPD] to bypass regular police procedures in order to violate plaintiff's alleged constitutional rights."  *Haley*, 2015 WL 4987564, at *7.  Although courts must be cautious in resolving cases on summary judgment that turn on a defendant's state of mind, *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473 (1962), this is an instance in which Plaintiff's conspiracy allegations are "mere conjecture and speculation," *Moore*, 890 F.2d at 834.  The Court finds that Mainwaring's brief huddle with law enforcement upon his arrival at Lover's Lane—absent any testimony as to the conversation within—combined with an uncorroborated comment from Mainwaring are not sufficient circumstantial evidence for a reasonable jury to infer that a conspiracy was afoot.  The Court **GRANTS** Wal-Mart's motion for summary judgment on the civil-conspiracy claim.

### B.  Ohio False Arrest Claim

The elements a plaintiff must show to prevail on a false-arrest claim under Ohio law are: "(1) the intentional detention of the person, and (2) the unlawfulness of the detention." *Barnes v.*

14

*Meijer Dep't Store*, 2003-09-246, 2004 WL 720906, at *3 (Ohio Ct. App. Apr. 5, 2004); *Ficklin v. Home Depot, U.S.A. Inc.*, No. 94458, 2010 WL 4684652, at *4 (Ohio Ct. App. Nov. 18, 2010). A cause of action for false arrest may be brought only against the persons making the arrest or their employers. *Id.* Because private citizens who call upon assistance from law enforcement are insulated from liability for false arrest if their request for assistance does not amount to a request for arrest, Mason must show that his arrest by law enforcement was "so induced or instigated by the defendant that the arrest [wa]s made by the officer, not of his own volition, but to carry out the request of the defendant." *Id.*; *see also Beverly v. Lawson Co.*, No. 45119, 1983 WL 4607, at *4 (Ohio Ct. App. Aug. 18, 1983). There is no liability "if a person merely gives information to an officer tending to show a crime has been committed." *Barnes*, 2004 WL 720906, at *4. When a private citizen "merely summons an officer for assistance because of a disturbance and does not specifically request that the person be arrested nor supply the false information to the police which causes the arrest, the citizen is not liable." *White v. Standard Oil Co.*, 474 N.E.2d 366, 367 (Ohio Ct. App. 1984).

Plaintiff's response in opposition to Defendant's motion for summary judgment offers little in the way of argument on this claim. He makes only a conclusory statement that there is direct and circumstantial evidence in the record that shows a genuine dispute of material fact as to whether Mason's arrest was instigated by Mainwaring. (Doc. 78 at 18.) The Court finds that, in fact, there is no evidence in the record that the arrest was "made by the officer, not of his own volition, but to carry out the request of" Mainwaring. *Ficklin v. Home Depot U.S.A. Inc.*, 2010 WL 4684652, at *4. First, Burner's call to the police "was not a request to apprehend" Mason. *Barnes*, 2004 WL 720906, at *4. He even stated that he was unsure whether Mason was shoplifting. Second, even if Mainwaring asked the SPD to bring the Jeep to the Wal-Mart

15

parking lot so he could examine the merchandise, Mason has not offered any evidence to suggest that Mainwaring asked the police to *arrest* Mason. In fact, all the evidence points in the other direction. Mainwaring came to Lover's Lane at the request of the police and pointed out that several items in the Jeep did not belong to Wal-Mart. Mainwaring did not search the vehicle himself. Mainwaring and Deputy Sterling both stated that Mainwaring, after watching the security video, said he saw no evidence of Mason shoplifting on that video.

Therefore, there is no material dispute that the arrest was instigated by the SPD to carry out the request of Burner or Mainwaring. The Court **GRANTS** Wal-Mart's motion for summary judgment on the false-arrest claim.

### C. Conversion Claim

The Ohio cause of action for conversion allows a plaintiff to bring a claim against a defendant for "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.*, 551 N.E.2d 172, 175 (Ohio 1990); *see also Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 493 N.E.2d 289, 292 (Ohio Ct. App. 1985). Plaintiff must prove the following elements to prevail on a conversion claim: "(1) Defendant's exercise of dominion or control over (2) Plaintiff's property, (3) wrongfully or in a manner inconsistent with Plaintiff's rights of ownership." *Contorno v. Small*, No. 1:10-cv-165, 2011 WL 4499234, at *5 (N.D. Ohio Sept. 27, 2011).

Wal-Mart contends that Mason's conversion claim must be dismissed because Wal-Mart employees did not exercise *wrongful* dominion over Mason's property. (Doc. 70 at 16.) That is, Mainwaring and Burner "merely cooperated with the SPD's investigation and followed their instructions to take possession of merchandise that was discovered in Mason's Jeep and deliver it

16

to Walmart's Weirton, West Virginia location." (*Id.*)  They contend that their dominion over the property was not wrongful because neither man asked to take possession of the merchandise. (*Id.*)  Mason offers two responses to this argument.  First, he argues that Wal-Mart did not merely hold the property for the police but, in fact, sold it.  (Doc. 78 at 19.)  Second, he contends that Mainwaring took and kept his personal satchel and its contents, which the police did not direct him to do.

Wal-Mart is correct that there is uncontroverted evidence that Mainwaring and Burner followed the SPD's instructions to take possession of the merchandise in the Jeep and have it delivered to Wal-Mart's Weirton location, and that sometime over the next few days Weirton Wal-Mart employees picked up those items.  (Mainwaring Dep., Doc. 71-3 at 69; Palmer Dep., Doc. 71-6 at 41-42.)   It is also uncontroverted that this merchandise that was eventually taken to the Weirton Wal-Mart was never returned to Mason or handed over to the police and, therefore, presumably was retained by Wal-Mart.[5]  Mason argues that this evidence could be construed as sufficient to show a material dispute over whether Wal-Mart exercised wrongful dominion over the property to the exclusion of Mason's rights.  *Joyce*, 551 N.E.2d at 175.  Even though Wal-Mart is persuasive that Mainwaring and Burning did not wrongfully *take possession* of the property on the night of the incident, Wal-Mart could nevertheless be liable for conversion if its employees at some point became aware that the property was not stolen from Wal-Mart and, in fact, rightfully belonged to Mason.

---

[5] There is also some confusion in the record as to the value of the merchandise at issue.  Officer Palmer testified in his deposition that there was $553.60 worth of Wal-Mart property that the SPD handed over to Mainwaring and Burner that night.  (Palmer Dep., Doc. 71-6 at 110.)  Mason, on the other hand, testified that there was just over $500 worth of unopened packages in the Jeep, some of which came from other stores as well, and he did not know how much of it came from Wal-Mart.  (Mason Dep., Doc. 67 at 60-61, 174.)  Therefore, it is undisputed that Wal-Mart retained certain items worth no more than $553.60 in total, but the exact value is unknown.

Unfortunately for Mason, though, there is no testimony from either Burning or Mainwaring (or anyone else from Wal-Mart) that they were aware that the property was not stolen.  Importantly, Ohio law has traditionally required a demand by the plaintiff and refusal by the defendant in order to prove the conversion of property otherwise lawfully held.  *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 493 N.E.2d 289, 292 (Ohio Ct. App. 1985) (citing *Fidelity & Deposit Co. v. Farmers & Citizens Bank*, 52 N.E.2d 549, 550 (1943)).  In *Ohio Telephone Equipment and Sales*, the Ohio Court of Appeals found that "if the original taking was rightful and no act of dominion or control inconsistent with plaintiff's ownership had taken place, a demand and refusal are necessary." *Id.* at 292.  In that case, the plaintiff had made an initial demand for the return of the property in question, but the plaintiff had not made that demand after the defendant lawfully took possession, as the landlord, of the office that held the property.  *Id.*  The court held that in such a case a new demand and refusal was necessary to establish a claim for conversion.  *Id.*  Although here the initial taking of the property may not have been lawful, the key inquiry is whether it was lawful for Mainwaring and Burning to have kept the property at the instruction of the SPD.  Having found that it was, the Court also finds Mason must show evidence of a new demand and refusal, which he has not done.

As to the satchel, Mason stated in his deposition that Mainwaring took the satchel, which contained his checkbook, wallet, and keys, out of the Jeep and brought it into Wal-Mart, and that Mason never saw the satchel or its contents again.  (Mason Dep., Doc. 67 at 178-79.)  None of the officers testified that they saw Mainwaring take the satchel or its contents, and the SPD's property inventory form reveals that when Mason was booked, the SPD confiscated his wallet, checkbook, and keys.  (Doc. 78-1 at 23, 24, 26.)  Mason's testimony that Mainwaring took his satchel and never returned it or the items therein is, therefore, "blatantly contradicted by the

record" and is insufficient to raise a material issue of fact so as to survive summary judgment. *Scott*, 550 U.S. at 380. Accordingly, the Court **GRANTS** Wal-Mart's motion for summary judgment on the conversion claim.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Wal-Mart's Motion for Summary Judgment (Doc. 70) on all claims. This case is **DISMISSED**. The Clerk is directed to enter Judgment for Wal-Mart.

**IT IS SO ORDERED.**

                                       s/ Algenon L. Marbley
                                       **ALGENON L. MARBLEY**
                                       **UNITED STATES DISTRICT JUDGE**

**DATED: May 9, 2016**